**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARTESA LEE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20 CV 1508** |
| | ) | |
| **v.** | ) | **Judge John J. Tharp, Jr.** |
| | ) | |
| **CITY OF CHICAGO, a municipal** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| **corporation, Chicago Police Officer** | ) | |
| **RAYMOND J. HARAN, and Chicago** | ) | |
| **Police Sergeant WILLIAM J. SPYKER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendant City of Chicago has filed a motion for entry of a protective order to bar the deposition of Sydney Roberts, then Chief Administrator of the City's Civilian Office of Police Accountability ("COPA"). (Dckt. #35). After Roberts resigned from COPA on May 5, 2021, plaintiff Martesa Lee filed a motion to summarily deny the City's motion for a protective order and to re-open fact discovery for the limited purpose of deposing Roberts. (Dckt. #50). For the reasons stated below, the Court grants the City's motion for a protective order and denies plaintiff's motion.

**I.    BACKGROUND**

Plaintiff alleges that defendants Chicago police officer Raymond Haran and sergeant William Spyker arrested her without probable cause and in retaliation for the fact that she threatened to complain about the misconduct of Haran. In particular, plaintiff alleges that defendant officers responded to a stabbing incident on the subway platform at the Chicago Transit Authority's ("CTA") red line Jackson Station on February 4, 2020. (Dckt. #12 at 3). Plaintiff was the supervisor on duty at the Jackson Station that day. (*Id.*) While plaintiff was

standing on the station platform, Haran approached her and instructed that she leave the crime scene. (*Id.*) Haran then grabbed plaintiff and led her away. (*Id.* at 4). Shortly after, plaintiff approached Spyker, reported that Haran had grabbed and pushed her, and stated that she wanted something to be done about it. (*Id.* at 5). Spyker responded by telling plaintiff that if Haran told him that plaintiff "w[as] obstructing the crime scene, we're gonna arrest you." (*Id.*) After plaintiff expressed disbelief that she could be arrested for doing her job and stated that she was not willing to let the situation go, Spyker ordered Haran to place her under arrest. (*Id.* at 5-6). Defendants detained plaintiff for a total of eight minutes on the station platform and eventually released her. (*Id.*) Both Haran and Spyker were wearing body-worn cameras that recorded their interactions with plaintiff. (Dckt. #35 at 2).

On February 10, 2020, plaintiff filed a complaint with COPA against Haran and Spyker. COPA thereafter initiated an on-going investigation into the incident. On June 16, 2020, Roberts signed and sent a five-paragraph memorandum (the "Memo") to Superintendent David Brown. (*See* Dckt. #35-1). In the Memo, Roberts: (1) informed Brown of the on-going COPA investigation; (2) recounted plaintiff's allegations and cited to the footage from defendants' body-worn cameras – with citations to specific times – that documented the actions of which plaintiff complained; (3) indicated that Spyker's handling of plaintiff's complaint regarding Haran "may have been in violation of Department policy regarding the treatment of complaints of misconduct;" (4) recommended that the Department evaluate the current assignment of Spyker and consider relieving him of police powers in consideration of the "video evidence;" and (5) requested that Brown contact COPA Deputy Chief Investigator Andrea Kersten if he wanted "to discuss the matter or ha[d] any questions." (*Id.*)

Plaintiff issued a notice of deposition for Roberts and sought her testimony because she sent the Memo and she could provide "helpful context" about the problem with officers arresting civilians who complain about them. (Dckt. #35-4 at 3.) The City refused to produce Roberts for a deposition pursuant to the "apex doctrine" and the limitations on discovery imposed by Rule 26(b). Instead, the City offered to provide plaintiff with alternative means of discovery to explore these issues.[1] After plaintiff rejected the City's alternatives, the City filed the instant motion for a protective order. After Roberts resigned from her position as COPA's Chief Administrator, plaintiff filed a motion urging the Court to summarily refuse to issue a protective order based on the theory that Robert's resignation mooted the issues raised by the City's motion. The parties' motions are ripe for disposition.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 26(c) provides that protective orders may address "matters relating to a deposition" and that a court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c)(1); *Olivieri v. Rodriguez*, 122 F.3d 406, 409 (7th Cir. 1997), *cert. denied*, 522 U.S. 1110 (1998). The party seeking a protective order bears the burden of demonstrating why the order should be entered. *Global Material Techs., Inc. v. Dazheng Metal Fibre Co., Ltd.*, 133 F.Supp.3d 1079, 1084 (N.D.Ill. 2015).

The City asserts that the deposition of former COPA Chief Administrator Roberts should be precluded by the "apex doctrine" under the circumstances present here. When such "apex" depositions are sought, courts may protect high-level executives from being deposed when *any*

---

[1] In particular, the City offered to provide plaintiff with a Rule 30(b)(6) witness, a limited deposition on written questions, and interrogatory answers. (Dckt. #35 at 7.)

of four circumstances exist: (1) the official has "no unique personal knowledge of the matter in dispute;" (2) the information can be garnered from other witnesses or (3) other discovery methods; and (4) sitting for the deposition would impose a hardship in light of the officer's other duties. *See, e.g., Little v. JB Pritzker for Governor,* No. 18 C 6954, 2020 WL 868528, at \*1 (N.D.Ill. Feb. 21, 2020) (citing multiple cases).[2] "'As such, the apex doctrine . . . is not an ironclad rule, but bespeaks sensitivity to the risk that very valuable executive time would be wasted where the officer has no real information.'" *Id., quoting Dyson, Inc. v. Sharkninja Operating LLC*, No. 14 C 779, 2016 WL 1613489, at \*1 (N.D.Ill. Apr. 22, 2016) (internal quotes and citation omitted).

Furthermore, contrary to the theory underlying plaintiff's motion, the fact that Roberts has resigned from COPA does not automatically defeat the application of the apex doctrine. To the contrary, it is well-settled that "[t]he apex doctrine is no less applicable to former officials than to current officials." *Fed. Deposit Ins. Corp. v. Galan-Alvarez*, No. 1:15-MC-00752 (CRC), 2015 WL 5602342, at \*4 (D.D.C. Sept. 4, 2015); *Thomas v. Cate*, 715 F.Supp.2d 1012, 1049-50 (E.D.Cal. 2010); *United States v. Wal-Mart Stores, Inc.*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at \*3-4 (D.Md. Mar. 29, 2002).

---

[2] Plaintiff asserts that the Seventh Circuit has not adopted the apex doctrine. *See* Dckt. #37 at 2 (citing to *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 CV 2207, 2017 WL 6059770, at \*3 (N.D.Ill. Dec. 7, 2017)). However, *Nucap* itself applied the apex doctrine with reliance on the Seventh Circuit's prior decision in *Patterson v. Avery Dennison Corp.,* 281 F.3d 676 (7th Cir. 2002), where the Court of Appeals affirmed the district court's decision to block the deposition of a high-level executive because there was "serious doubt" as to whether the executive had information that was more than marginally relevant to plaintiff's claim and plaintiff had failed to take advantage of a more inexpensive and convenient method of discovery (namely, the use of interrogatories). *Nucap,* 2017 WL 6059770, at \*2 (citing to *Patterson,* 281 F.3d at 681-82). The *Nucap* court issued a protective order barring the high level executive's deposition after finding that he was not involved in the actions giving rise to plaintiffs' claims, plaintiffs had less burdensome avenues for obtaining the information that they sought from him, and that the deposition would be unduly burdensome and would significantly disrupt defendant's business. *Nucap,* 2017 WL 6059770, at \*2-4.

III.     **DISCUSSION**

The City offers several arguments in support of its position that Roberts should not be subjected to a protective order, including that: (1) Roberts does not possess any unique or specific knowledge regarding the February 4, 2020 incident that underlies plaintiff's claims or the COPA investigation; (2) the relevant information that plaintiff seeks from Roberts could be obtained from less intrusive means; (3) information that plaintiff seeks from Roberts regarding COPA's decision-making process is arguably privileged and not relevant to the parties' claims and defenses; and (4) ordering Roberts to sit for a deposition would set an untenable precedent.[3] The Court agrees with each of these points.

**A.     Roberts lacks unique or specific knowledge of the incident or of the COPA investigation**

The record establishes the following. Roberts was not present during the February 4 incident and therefore has no first-hand knowledge of what occurred in the Jackson Station on that day. (Dckt. #35 at 5-6). Nor is there any evidence that she interviewed any participant or witness to the incident or took an active role in COPA's investigation. Instead, as the Memo reflects, it appears that Roberts' knowledge of the incident is based on her review of the footage from the officers' body-worn cameras. (*Id.*; Dckt. #35-1). Plaintiff has offered no evidence to support her assertion that Roberts has "specific knowledge of the facts of the case" over and above what she gleaned from the body-worn camera footage. The Court also finds it significant that Roberts closes the Memo with the statement that Superintendent Brown should contact Deputy Chief Investigator Andrea Kersten – and not her – if he wanted to discuss the matter or

---

[3] The City also asserts that allowing a deposition of Roberts would impose an unwarranted hardship on the City and the public because it would interfere with her official duties. (Dckt. #35 at 8-9). Now that Roberts has resigned, this concern is no longer present. *See Thomas*, 715 F.Supp.2d at 1049-50 (noting that the concern about interference with official duties falls by the wayside with respect to former officials).

had any questions.  This clearly implies that she had nothing further to add to what had been written in the Memo.

Courts have not hesitated to block efforts to depose high-ranking officials where – as here – the officials do not have unique personal knowledge of the facts underlying the events that lead to the lawsuit in question.  *See, e.g., Little*, 2020 WL 868528, at *2 (holding that the governor should not be deposed where he lacked unique or specialized knowledge relevant to the litigation), at *3 (holding that the lieutenant governor should not be deposed regarding plaintiffs' discrimination claims where she lacked "unique personal knowledge" of them); *Murillo v. Kohl's Corp.,* No. 16-CV-196-JPS, 2016 WL 6090862, at *3 (E.D.Wis. Oct. 18, 2016) (holding that defendant's chief merchandising and customer officer should not be deposed where she lacked "any 'specialized' or 'unique' knowledge about the manner in which the defendants price[d] their merchandise"); *Hudkins v. City of Indianapolis,* No. 1:13-CV-01179-SEB, 2015 WL 4664592, at *7 (S.D.Ind. Aug. 6, 2015) (blocking deposition of police chief where plaintiffs "utterly failed to demonstrate that he has any personal knowledge of the events of September 6, 2012 – indeed any personal knowledge of [defendant] Officer Wilson.").

Without a showing that Roberts has some unique personal knowledge, the fact that she was made aware of plaintiff's allegations or that she viewed the video of the incident and voiced support for COPA's investigation in a letter to Superintendent Brown is insufficient to warrant her deposition.  *See Little*, 2020 WL 868528, at *2 (blocking the governor's deposition despite the fact that he was made aware of plaintiffs' allegations); *Hudkins*, 2015 WL 4664592, at *7 (blocking deposition of police chief despite the fact that he viewed the video of the underlying incident and ordered an investigation).

Plaintiff's assertion that "courts have . . . repeatedly ordered high-ranking City officials to sit for deposition or testify for trial, even when the official in question did not have unique firsthand knowledge about the underlying issues in the case" is not supported by the cases she cites. The first decision, where the magistrate judge ordered that Mayor Richard M. Daley sit for a deposition, was reversed by the district judge after the City objected. *Hobley v. Burge*, No. 03 C 3678, 2007 WL 551569 (N.D.Ill. Feb. 22, 2007), *rev'd,* No. 03 C 3678, Order (N.D.Ill. Dec. 7, 2007) ("The objections of the defendant City of Chicago to the February 27, 2007 Order . . . granting plaintiff's motion to compel the deposition of Mayor Richard M. Daley are sustained."). In the second case, plaintiffs were allowed to call Mayor Emanuel as a trial witness regarding an issue related to their *Monell* claim (namely, his comments regarding the existence of a "code of silence") and not regarding the underlying incident. *Spalding v. City of Chicago,* No. 1:12-CV-8777, Order (N.D.Ill. May 18, 2016). *Spalding* is distinguishable because plaintiff does not have a *Monell* claim here. In the third case, Superintendent McCarthy was ordered to sit for a deposition for reasons "stated in open court." *Whitaker v. City of Chicago,* No. 11-CV-7362, Order (N.D.Ill. Feb. 16, 2012). Plaintiff's exhibit suggests that Superintendent McCarthy was to be deposed about his knowledge of the defendant officer's two prior shootings and his opinion that the officer should have been on desk duty prior to the third shooting, which led to the lawsuit in question. Those circumstances are different from this case.[4]

---

[4] Finally, plaintiff cites to an Illinois state court case where Mayor Emanuel and Superintendent Johnson were ordered to sit for their depositions under Illinois procedural rules. *Legrier v. City of Chicago,* No. 15 L 12964 (Ill.Cir.Ct.). Plaintiff has not provided the state court's rationale for its order and this Court is thus unable to determine whether the circumstances in *Legrier* are analogous to this case. Nonetheless, Plaintiff's exhibit suggests that Mayor Emanuel would be questioned about policy-related issues (*i.e.,* "use of force policies," the "code of silence" among officers, and "the aggressive legal gambits the city's lawyers ha[d] pursued") and not the facts of the underlying incident (Dckt. #37-2 at 3, 4).

**B.    The relevant information that plaintiff seeks to obtain from Roberts can be obtained by less intrusive means**

The City asserts that much of the information that plaintiff seeks to obtain from Roberts at her deposition has already been – or can be – obtained by less intrusive means.  In particular, the City asserts – and the Court agrees – that the best evidence about the underlying incident is provided by plaintiff's own testimony and the depositions and body worn camera footage of Haran and Spyker.  With respect to the COPA investigation, to the extent that it is relevant to the parties' claims or defenses, the City has agreed to stipulate to the authenticity of the Memo. (Dckt. #35 at 7).  The City also asserts – without contradiction by plaintiff – that a deposition from the COPA investigator who actually conducted the investigation and concluded that rules violations had occurred and that discipline would be appropriate would be a more knowledgeable witness on these topics than Roberts.  Plaintiff could have served requests for admission to confirm the findings.  Furthermore, as noted above (*supra,* at note 2), the City made an offer – which plaintiff eschewed – to provide plaintiff with a Rule 30(b)(6) witness, a limited deposition on written questions, and interrogatory answers.

Plaintiff does not dispute the above propositions.  Instead, she insists that Roberts' testimony is needed to support her claims for compensatory and punitive damages.  (Dckt. #37 at 4-5).  It is difficult to understand how Roberts' testimony could shed any light on "the uniquely harmful effect Defendant Spyker's conduct had on [plaintiff]," as plaintiff asserts.  (Dckt. #37 at 5).  Roberts, to the Court's knowledge, does not know plaintiff.  How a person would react to Spyker's allegedly illegal conduct depends upon the person.  Some folks would be deeply traumatized by being threatened with arrest and detained in custody for eight minutes simply for trying to do their job.  Other folks might shrug off such an encounter and consider themselves fortunate that the situation did not escalate further.  Plaintiff is unquestionably the best source of

8

evidence about how this event affected her. Roberts' proposed testimony on this subject would be nothing more than speculation.

Similarly, the Court does not agree with plaintiff's assertion that Roberts' testimony is necessary to "assist the jury in understanding not only that [plaintiff] was arrested without probable cause, but *why* she was arrested, why it matters, and why it is important that Defendant Spyker's conduct not be repeated by him or other officers in the future." (Dckt. #37 at 5 (emphasis in original)). To reiterate, as explained above, there are less intrusive means of obtaining probative evidence that will assist the jury in determining why plaintiff was arrested and whether she was, in fact, arrested without probable cause. Furthermore, there is no indication that the City is going to disagree with the proposition that persons should not be arrested by Chicago police officers unless there is probable cause to support the arrest. Finally, the Memo itself explains why the alleged conduct of Spyker (namely, threatening a civilian with arrest for reporting police misconduct) damages "the Department's efforts to rebuild trust with the community," "demonstrates a profound lack of judgment," and "brings significant discredit to the Department." (Dckt. #35-1 at 1-2). Since the City has agreed to stipulate to authenticity of the Memo (Dckt. #35 at 7), Roberts' testimony is not necessary to establish these points.

**C.** **Information that plaintiff seeks to obtain from Roberts regarding COPA's decision-making process is arguably privileged and irrelevant**

Plaintiff also seeks to have Roberts testify "why she and/or COPA took the unusual step of determining that the allegations and the evidence warranted relieving Defendant Spyker of his police powers pending the investigation, and whether it is related to Chief Roberts' strong opinions about the gravity of Spyker's apparent conduct and the threat it poses to policy community relations." (Dckt. #37 at 6). However, as the City asserts, any deposition testimony by Roberts regarding COPA's decision-making process that culminated in the issuance of the

Memo is arguably protected by the deliberative-process and investigative privileges. *See United States v. Farley,* 11 F.3d 1385, 1389 (7th Cir. 1993) ("The deliberative process privilege protects communications that are part of the decision-making process of a governmental agency. . . . Since frank discussion of legal and policy matters is essential to the decisionmaking process of a governmental agency, communications made prior to and as part of an agency determination are protected from disclosure") (citations omitted); *Santiago v. City of Chicago*, No. 09 C 3137, 2010 WL 1257780, at *4 (N.D.Ill. Mar. 26, 2010) ("The City . . . has a legitimate interest in preserving the confidentiality of an ongoing IPRA investigation").[5] Even plaintiff acknowledges that the question of whether Roberts would be allowed to testify regarding these matters would be "the subject of future motion practice." (Dckt. #37 at 6).

The Court also agrees that Roberts' knowledge of why COPA wrote and sent the Memo to Superintendent Brown is not relevant to the parties' claims or defenses within the meaning of Federal Rule of Evidence 401. The material issues in this case do not concern COPA's investigative process. Furthermore, evidence concerning this process does not have a tendency to make it more or less probable that plaintiff was arrested without probable cause and/or in retaliation for plaintiff's statement that she wanted to file a complaint about the alleged misconduct of Haran.

### D. Ordering Roberts to sit for a deposition under the circumstances of this case would set an adverse precedent

In her motion, plaintiff asserts that Roberts' resignation as COPA's Chief Administrator moots the City's motion for a protective order. Although plaintiff is correct in the limited sense that one rationale for the City's motion (namely, that forcing Roberts to sit for a deposition would interfere with her official duties) has been eliminated by virtue of Roberts' resignation

---

[5] COPA's investigation of the underlying incident remains on-going. (Dckt. #52 at 6).

(*supra,* at note 3), other important rationales for the apex doctrine remain "appl[icable] to former officials and current officials with equal force." *Galan-Alvarez*, 2015 WL 5602342, at *4. In particular,

> [t]he integrity of administrative proceedings and the underlying decisionmaking process of agency officials are just as important where the official to be questioned no longer serves in the same position. And 'indiscriminate depositions of high-ranking government officials would . . . likely discourage' people 'from accepting positions as public servants' irrespective of whether those deposed were current or former officials.

*Id.*, *quoting Wal-Mart Stores,* 2002 WL 562301, at *3. Furthermore, Roberts' resignation does not change the fact that she has no unique personal knowledge of the underlying incident or the COPA investigation. Given the circumstances discussed above, the Court finds that the concerns expressed by the *Galan-Alvarez* and *Wal-Mart Stores* decisions are fully warranted here.

## CONCLUSION

For all of the above reasons, defendant City of Chicago's motion for entry of a protective order to bar the deposition of Sydney Roberts (Dckt. #35) is granted and plaintiff's motion for denial of the City's motion for a protective order and to re-open fact discovery for a limited purpose (Dckt. #50) is denied.


**Dated: June 11, 2021**


**Hon. Jeffrey Cummings**
**United States Magistrate Judge**